## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

DAVID DAVISON,

      Plaintiff,

      v.

STACEY LYNN KENNEDY, et al.,

      Defendants.

CIVIL ACTION NO. 3:15-cv-01373

(SAPORITO, M.J.)

## **MEMORANDUM**

This federal civil rights action was commenced on July 14, 2015, when the plaintiff, David Davison, represented by counsel, filed his original complaint, asserting a variety of federal civil rights and state law claims against a number of defendants. (Doc. 1.) On February 11, 2016, on the defendants' motion, the Court dismissed several claims and most of the defendants from this action. (Doc. 24; Doc. 25.)[1] After this dismissal, only two of the defendants remained: parole officers Christopher Taylor and Douglas Sheaffer.

The case was subsequently assigned to us upon the consent of the

---

[1] *See Davison v. Kennedy*, Civil Action No. 3:15-1373, 2016 WL 538906 (M.D. Pa. Feb. 11, 2016) (opinion); *Davison v. Kennedy*, Civil Action No. 3:15-1373, 2016 WL 538907 (M.D. Pa. Feb. 11, 2016) (order).

parties, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 29; Doc. 30.) On January 9, 2017, the plaintiff filed his amended complaint, which substituted Valerie Taylor, Administrator of the Estate of Christopher Taylor, in place of her decedent, and which pared the plaintiff's claims down to those federal civil rights that survived dismissal. (Doc. 40.)

Following the close of discovery, the remaining defendants filed a motion for summary judgment, together with a statement of material facts, evidentiary exhibits, and a brief in support. (Doc. 80; Doc. 81; Doc. 82.) The plaintiff has filed a brief in opposition, together with a response to the statement of material facts and additional evidentiary exhibits. (Doc. 85; Doc. 86.) The defendants have filed a reply brief. (Doc. 89.) The matter is ripe for disposition.

## I. BACKGROUND

The material facts of this case are largely undisputed.

On May 5, 2008, following a guilty plea, the plaintiff was convicted of felony aggravated assault and sentenced by the Court of Common Pleas for Lackawanna County, Pennsylvania, to serve a term of

imprisonment followed by a term of special probation.[2] As a condition of his special probation, Davison was to refrain from assaultive behavior.

On March 25, 2015, Davison was serving his term of special probation and subject to the supervision of the Pennsylvania Board of Probation and Parole (the "Board"). Agent Taylor was his supervising parole agent. Agent Taylor apparently received a phone call from a complainant, Stacy Kennedy, who alleged that she had been sexually assaulted by Davison.

Agent Taylor asked Agent Sheaffer to accompany him and assist him in meeting with Kennedy. Agent Sheaffer was not familiar with Davison or Kennedy, but he was familiar with the Carbondale area,

---

[2] "'Special' probation following a state sentence is authorized by 61 Pa. [Cons. Stat. Ann.] § 6133(a). Although this section provides for probation supervised by the Pennsylvania Board of Probation and Parole . . . , the trial court nevertheless retains the power, authority, and jurisdiction to assess whether the defendant violated his or her special probation, to revoke it and to re-sentence the defendant following a revocation." *Commonwealth v. Brooke*, No. 2289 EDA 2012, 2013 WL 11262891, at *1 n.2 (Pa. Super. Ct. June 17, 2013) (citing *Commonwealth v. Mitchell*, 955 A.2d 433, 440–41 (Pa. Super. Ct. 2008)). "The Board's function regarding special probationers is supervisory, and it 'does not have the power to grant or establish the terms of or to revoke probation.'" *Menifee v. McVey*, Civil Action No. 09-104, 2009 WL 413773, at *2 (W.D. Pa. Feb. 17, 2009). *See generally Mitchell*, 955 A.2d at 441 (Klein, J., concurring) (discussing the practical reasons for this sentence structure involving a period of imprisonment followed by special probation).

where Kennedy resided, because he was responsible for supervising individuals on parole or probation who resided in that community.

Agent Taylor contacted Aaron Haley, a detective with the Carbondale police, and advised him that Kennedy wanted to file a report that Davison had raped her. Agents Taylor and Sheaffer met Kennedy at her apartment and drove her to the police department, which was nearby. Taylor and Sheaffer were only at Kennedy's apartment for a few minutes and did not search for any evidence there.

At the police department, they met with Detective Haley, whom Agent Sheaffer had known professionally for many years. Detective Haley interviewed Kennedy, with Agents Taylor and Sheaffer present. According to an affidavit of probable cause later prepared by Detective Haley:

> At approximately 0940Hrs. Agent Taylor along with Agent Doug Sheaffer accompanied Ms. KENNEDY to the C.I.D. within the Carbondale Police Department for an interview on the alleged rape. Ms. KENNEDY stated that she first met Mr. DAVISON about three weeks ago at the Mall in Dickson City. Ms. KENNEDY stated she was with two of her children at this time, when Mr. DAVISON approached her. Ms. KENNEDY stated during this time, at the food court, they exchanged phone numbers to set up a future date. Ms. KENNEDY stated that Mr. DAVISON took her to Olive Garden one time on a lunch date in Dickson City and they had a few

drinks. Ms. KENNEDY state there was a time Mr. DAVISON took her to his mother's business [and] home in the Clark Summit area. Ms. KENNEDY stated that she was never intimate with Mr. DAVISON and that he wanted to have a relationship with her, but she stated that she wasn't ready for a relationship with him and that's when things started to get bad. Ms. KENNEDY stated that it was the Monday before the rape, March 15, 2015, she was a passenger in Mr. DAVISON's black Mercedes vehicle. Ms. KENNEDY stated that he took [her] out to some state park, which was believed to be the Lackawanna State Park in Benton Twp.[,] Lackawanna County. Ms. KENNEDY state[d] that while parked at the park, Mr. DAVISON tried to sexually assault[] her by groping her and putting his hands inside her shirt, and Ms. KENNEDY stated she told him to stop and he became psycho, telling her he gets what he wants. Ms. KENNEDY stated that he sped out of the park area at a high rate of speed, and drove her back to her apartment in Carbondale, without talking about anything the whole trip back. Ms. KENNEDY stated that as she was getting out of Mr. DAVISON's car, he told her that this wasn't over and Dave gets what Dave wants, then sped off and left. Ms. KENNEDY then stated on Friday, March 20, 2015[,] it was around 945-1000Hrs.[,] she was in her bedroom, wearing a t-shirt and boxer shorts when she heard someone enter the apartment. Ms. KENNEDY stated that she went out of her bedroom into the kitchen area, and found Mr. DAVISON entering through the back door. Ms. KENNEDY stated she thought it was the building manager at first, named Glenn Donahue. Ms. KENNEDY stated that she thought the rear door to the apartment was locked but she stated it wasn't. Ms. KENNEDY stated her front door to the apartment was locked. MS. KENNEDY stated that she began to tell Mr. DAVISON that he has serious issues and that she didn't want to continue having a relationship with him. Ms.

KENNEDY stated that Mr. DAVISON forced her backwards into her bedroom, pushed her down on to a couch, and raped her. Ms. KENNEDY stated that she didn't scream for help, and that he was very strong while holding her down. Ms. KENNEDY stated that Mr. DAVISON was wearing a Harley Davidson motorcycle jacket with a tan[n]ish knitted sweater underneath, and jeans. Ms. KENNEDY stated that he pulled his pants down and her pants down and raped her. Ms. KENNEDY stated that Mr. DAVISON ejaculated on her, got up, pulled his pants up and stated I told you I get what I want, then left. Ms. KENNEDY stated that she didn't see his penis, but stated the only characteristics she noticed on Mr. DAVISON was that he had lesions on his chest area. Ms. KENNEDY stated she saw the lesions on his chest . . . when he was on top of her she could see down his sweater. Ms. KENNEDY stated when Mr. DAVISON was done raping her, she got up and wiped the semen off her stomach and vagina area with a [b]unch of paper towels, and threw them in the garbage.

At this time, this officer asked why she waited five days to notify law enforcement, and she stated she was afraid of Mr. DAVISON and found out he was on parole and decided this morning to call the state parole agents to file the report. This officer asked Ms. KENNEDY to provide a written statement on everything she told this officer, but stated she couldn't at this time, due to her having to go to work at 1130Hrs. This officer along with both agents explained to Ms. KENNEDY that it was very important that she write a detailed statement and that we would call her work place to let them know she was going to be late, due to being a victim of a serious crime, to which she stated she didn't want to do that because she just started the job. This officer asked Ms. KENNEDY if I could escort her to her apartment to take pictures and to possibly gather the paper towels that

[she] stated was still in the garbage since that Friday morning, to which she stated yes. Before leaving the CID this officer handed Ms. KENNEDY a yellow tablet and asked her to provide a statement and to contact this officer when completed or by Monday, [March] 30th, when this officer would be back to work. Ms. KENNEDY also gave a brief written statement to state parole agents [which] stated that she was sexually abused by Mr. DAVISON.[3] Ms. KENNEDY also provided this officer with a car key belonging to one of Mr. [DAVISON]'s Mercedes.

(Doc. 81-1, at 24–25.)

After Detective Haley interviewed Kennedy, Agent Sheaffer asked Detective Haley in private if he believed Kennedy because she was "somewhat unemotional" and Agent Sheaffer was not experienced in conducting these types of interviews. At his deposition, Agent Sheaffer testified that Haley responded that he did believe her, but he had to do further investigation. For his part, Detective Haley testified at his deposition that, upon conclusion of the interview, he had no doubts about Kennedy's verbal statement—he only came to doubt her veracity through

---

[3] The handwritten note stated: "My name is Stacy Lyn Kennedy[.] I was sexually assaulted / raped by David Davison on Friday, March 20th[,] 2015[,] at my residence [at] 76 S. Main St[.,] Carbondale, Pa[.] 18407 . . . . I am in fear for my life and my children[']s li[ves] due to the actions he brought forth upon me[,] and he verbally threaten[ed] to kill me and my children[.]" (Doc. 81-1, at 16.)

*(continued on next page)*

the course of his follow-up investigation.

Following the interview, Agent Taylor discussed the case with the Scranton district director, who approved Davison's arrest.[4] Within hours after the interview with Kennedy, Agents Taylor and Sheaffer, accompanied by other parole agents and local police officers, arrested Davison at his home and took him to the parole office, and then to county jail.

On March 26, 2015, Agent Taylor prepared a written notice of charges, informing Davison that he was being charged with a technical violation of special probation condition #5C, which required him to refrain from assaultive behavior. In support, the notice stated: "On 03/20/2015 you sexually assaulted Stacy Lyn Kennedy." (Doc. 81-1, at 19.) Davison was served with the notice of charges on March 27, 2015, but he refused to sign it.

On March 27, 2015, Agent Taylor completed a technical violation

---

[4] The defendants contend that a violation warrant was also approved and issued. The plaintiff disputes the issuance of a warrant. We note that no copy of a warrant is found in the evidence before the Court, but Agent Taylor's arrest report does reference a warrant number 640120150029, purportedly filed on March 25, 2015. Whether a warrant was issued, however, is not material to the disposition of the plaintiff's claims.

arrest report recommending that Davison be detained pending disposition of technical violation charges due to his assaultive behavior, the seriousness of the charged offense, and the fact that this constituted an early failure of special probation because Davison has only recently been released from prison. Agent Taylor's supervisor and the district director concurred with the recommendation.

In conjunction with his arrest report, Agent Taylor also completed a supervision history form, in which he detailed the basis for the technical violation charges:

> On 02/04/2015 the subject reported to the Scranton DO [for] supervision on a 4 year 7 month 7 day special probation sentence from Lackawanna [C]ounty for the offenses of Aggravated Assault (F2) and Harassment (M3). The effective date of the sentence is 01/23/2015 with a maximum date of 08/30/2019.
>
> . . . .
>
> On 03/25/2015 this Agent received a voicemail from a Stacy stating she needed a call back ASAP regarding the subject. This Agent did speak with Stacy Kennedy who stated she had been raped by the subject and she was fearful for her life. The subject was advised to contact the Carbondale PD regarding the alleged rape. This Agent, Agent Sheaffer[,] and Detective Aaron Hailey of the Carbondale PD met with Stacy Kennedy on 03/25/2015 at the Carbondale PD. Detective Hailey interviewed Stacy Kennedy and started an investigation on the alleged rape. The alleged victim, Stacy

Kennedy[,] did provide a written statement to this Agent that stated she was sexually assaulted/raped by David Davison and she was in fear for her life and he life of her children.

This Agent notified [district director] Robert Jones of the statement and he authorized the arrest of David Davison. Parole supervision staff, along with multiple police departments, went to the subject's residence and placed him into custody without incident. The subject was transported to the Scranton [district office] and then lodged at the Lackawanna County Prison without incident.

(Doc. 81-1, at 21.)

Finally, that same day, Agent Taylor or his supervisor prepared a transmittal letter, signed by Taylor's supervisor, referring the case to the county court for further proceedings. The transmittal letter advised that Davison had been arrested for a technical violation, that he was being held in custody at Lackawanna County Prison and had requested a formal *Gagnon I* (probable cause) hearing, and that state parole staff recommended that he be held in confinement pending disposition of the technical violation.

Together with a brief cover letter dated March 27 2015, and summarizing the matter, Agent Taylor forwarded the transmittal letter, notice of charges, arrest report, and supervision history to Lackawanna

County for scheduling of Davison's *Gagnon I* and *II* hearings.

Immediately after the parole agents had departed following the interview with Kennedy, Detective Haley went back to her apartment to take photographs and gather any physical evidence. Haley noted the presence of several surveillance cameras in the area surrounding her apartment. Approximately one week later, on March 31, 2015, Detective Haley obtained a copy of surveillance video footage from a bar located on the ground floor of Kennedy's apartment building. On April 1, 2015, Detective Haley met with Davison's attorney, who provided him with potentially exculpatory text messages and video and photo images exchanged between Davison and Kennedy prior to March 20, 2015. Shortly after this meeting, Detective Haley and another police officer reviewed the surveillance video footage, which was inconsistent with Kennedy's earlier statement. At the time period when she claimed he had raped her, the video showed Kennedy and Davison both arriving at her apartment's front door and entering, then it showed Davison leaving approximately one minute later, and Kennedy running down the stairs after him 30 to 40 seconds later. At no time did it show Davison coming up the stairs to her back door and entering her kitchen as she had stated

in her interview.

That same day, April 1, 2015, Detective Haley contacted Agent Sheaffer and advised that, based on this additional evidence uncovered through his follow-up investigation, he would not be pressing criminal charges against Davison.[5] Agent Sheaffer relayed this information to Agent Taylor and his supervisor on or about that same day. The technical violation charge was withdrawn and Davison was released from Lackawanna County Jail on April 7, 2015.[6]

On May 20, 2015, Detective Haley filed a criminal complaint against Kennedy charging her with making false statements to law enforcement, to which she ultimately pleaded guilty.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the

---

[5] In the meantime, there had been no communication between Detective Haley and the defendants regarding Davison's case.

[6] It is not altogether clear from the record who made the decision to withdraw the charge and release Davison—state parole officials or county probation officials—nor is it clear when the decision was made.

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52. Thus, in evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does

the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III. DISCUSSION

The plaintiff has asserted the violation of his rights under the

Fourth and Fourteenth Amendments to the United States Constitution. The defendants seek summary judgment on the merits of these claims, arguing that they had probable cause to arrest and detain him, they had no duty to continue to investigate the allegations against him after his arrest, and his release from custody was not unreasonably delayed after the defendants learned from police that he would not be criminally charged.[7]

### A. Probable Cause

"The proper inquiry in a section 1983 claim based on false arrest or misuse of the criminal process is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988); *see also Heilman v. .W. Ponessa & Assocs.*, No. 4:07-cv-1308, 2008 WL 275731, at *9 (M.D.

---

[7] In their reply brief, the defendants also argue that they are entitle to qualified immunity from the plaintiff's federal civil rights claims. (*See* Doc. 89.) This argument was not previously raised in their principal brief. (*See* Doc. 82.) We decline to entertain this untimely argument. *See Brooks v. Reitz*, Civil Action No. 1:12-CV-2045, 2013 WL 2039096, at *3 n.2 (M.D. Pa. May 14, 2013) ("Arguments raised for the first time in a reply brief are generally waived because fairness requires that nonmovants have the opportunity to respond to any arguments presented by the movant.").

*(continued on next page)*

Pa. Jan. 30, 2008) ("To make out a Fourth or Fourteenth Amendment claim, whether based on a theory of false arrest, false imprisonment, or malicious prosecution, Heilman must demonstrate that revocation of his parole and his subsequent arrest were accomplished without probable cause.").[8] "[P]robable cause . . . exists when the facts and circumstances within the [charging] officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be [charged]." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016); *see also Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) ("Probable cause exists if there is a 'fair probability' that the person committed the crime at issue."). Whether the plaintiff actually committed the charged offense or was acquitted of the charge is irrelevant to a probable cause analysis. *See Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005).

> As the Supreme Court has observed, "in dealing with probable cause, as the very name implies, we deal with

---

[8] We note that, although parole officers in Pennsylvania can arrest parolees without a warrant for violations of their parole, "it is unclear whether a parole officer must have probable cause to arrest a parolee for parole violations, or whether a less demanding standard applies." *United States v. Noble*, 326 Fed. App'x 125, 127 (3d Cir. 2009). We need not resolve this question, however, as we ultimately find that the defendants had probable cause to arrest Davison.

probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." For this reason, the Court has eschewed "any rigid demand that specific 'tests' be satisfied" and has instead prescribed a "totality-of-the-circumstances approach" to the probable cause determination. That determination is necessarily fact-intensive, and it will usually be appropriate for a jury to determine whether probable cause existed. Nevertheless, summary judgment may be granted on the question of probable cause if a court concludes that "the evidence, viewed most favorably to the nonmoving party, reasonably would not support a contrary factual finding."

*Dempsey*, 834 F.3d at 467–68 (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983), and *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)) (brackets and ellipsis omitted).

Here, the defendants arrested Davison and initiated technical violation proceedings against him based on a detailed verbal statement by Kennedy alleging that he had broken into her home and sexually assaulted her. She specifically identified Davison as her attacker, and it is clear that he was well known to her. At the time of the interview, which preceded Davison's arrest by only a couple of hours, the interviewing officers had no reason to disbelieve her. They were unaware of any exculpatory evidence and there was nothing to suggest that she was an

unreliable witness. Absent "[i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers" to outweigh it, "a positive identification by a victim witness, without more, would usually be sufficient to establish probable cause." *Wilson*, 212 F.3d at 790; *see also Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) ("When a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause to arrest.") (assault victim identified her husband as attacker).

The plaintiff suggests that probable cause was lacking because the defendants failed to investigate further and obtain the exculpatory surveillance video footage that ultimately cleared him of the anticipated criminal charges. But police, or parole officers, have no obligation to obtain exculpatory video footage—or other forms of evidence—where the arresting officer was unaware of it at the time of the arrest. *See Waters v. Cheltenham Twp.*, 700 Fed. App'x 149, 153 (3d Cir. 2017) ("[E]ven though the footage ultimately led to the withdrawal of criminal charges, we still determine whether the proceeding was initiated without probable cause 'based on the information available to officers *at the time the arrest warrant was sought*.'") (brackets omitted); *see also Dempsey*, 834 F.3d at

471 ("[W]e look only to the information available to the officer at the time of the swearing of the affidavit of probable cause."); *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n.8 (3d Cir. 2000) ("[The arresting officer] was not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed."); *Rodriguez v. Scranton Police Dep't*, No. 3:10cv2022, 2013 WL 74292, at *9 (M.D. Pa. Jan. 4, 2013) ("[T]he mere absence of specific types of incriminating evidence, such as forensic evidence or third-party eyewitnesses, does not negate the probable cause established by other types of incriminating evidence.").

Viewing the evidence in the light most favorable to the plaintiff, we find that, based on the evidence known to the defendants at the time of the plaintiff's arrest, no reasonable jury could find that the defendants lacked probable cause to arrest the plaintiff.

### B. Failure to Investigate

The plaintiff appears to also argue that the defendants violated his rights in their failure to continue to investigate and uncover the exculpatory evidence that ultimately cleared him of criminal liability. But "once [an arresting officer] ha[s] a reasonable basis to believe there

[i]s probable cause, he [i]s not constitutionally required to 'investigate independently every claim of innocence.'" *Waters*, 700 Fed. App'x at 153; *see also id.* at 153–54 (distinguishing cases where officer knew of exculpatory evidence *before* arrest or warrant application); *Wilson*, 212 F.3d at 792 n.11 ("We also reject Wilson's suggestion that he has a due process claim because Russo should have done a better job of post-arrest investigation."); *Patterson v. Sch. Dist. of Philadelphia*, No. 99-CV-4792, 2000 WL 1020332, at *6 (E.D. Pa. July 19, 2000) ("Once a police officer has discovered sufficient facts to establish probable cause, the officer has no constitutional duty to further investigate in hopes of finding exculpatory evidence.").

Viewing the evidence in the light most favorable to the plaintiff, we find the defendants are entitled to judgment as a matter of law with respect to the plaintiff's claim that their failure to continue to investigate after his arrest based on probable cause violated his constitutional rights.

## C. Delayed Release

Finally, the plaintiff appears to argue that his release from county jail was unreasonably delayed because it took six days for him to be released after Detective Haley informed the defendants that he would not

be filing criminal charges against Davison. Detective Haley reviewed the exculpatory surveillance video footage on Wednesday, April 1, 2015. He contacted Agent Sheaffer that same day and informed him that he would not be filing criminal charges against Davison. Agent Sheaffer conveyed that information to Agent Taylor and his supervisor.[9] But Davison was not released until the following Tuesday, April 7, 2015.

As our sister court has previously observed, in addressing a similar six-day delay in a parolee's release:

> One would hope, of course, that once the board decides to release a detained parolee, the release will be effected as swiftly as possible. As Mr. Chief Justice Burger said in *Morrissey v. Brewer*, a parolee's liberty, though conditional, is so valuable an interest that it is protected by the provisions of the Fourteenth Amendment. Accordingly, when a parole board decides that detention of a parolee is no longer justified, the speedy restoration of that liberty is obviously a matter of high priority. Nevertheless, it would be manifestly unfair for a court to hold a parole board liable for a constitutional violation whenever a parolee's release is not effected as swiftly as the parolee (or the court) might desire. The due process standard is one of reasonable dispatch, not of instantaneous action.

*Burgess v. Roth*, 387 F. Supp. 1155, 1161–62 (E.D. Pa. 1975) (finding six-

---

[9] At his deposition, Agent Sheaffer was unable to recall if he relayed the information that same day or the next day.

day delay in parolee's release not unreasonable, and therefore not unconstitutional) (citation omitted); *see also Regan v. Upper Darby Twp.*, 363 Fed. App'x 917, 924–25 (3d Cir. 2010) (five-day delay in releasing arrestee after posting bail not unreasonable).

Here, the plaintiff was released six days after Detective Haley advised Agent Sheaffer that he would not be filing criminal charges. We note that the six-day period included a weekend, and that Davison's release required not only action by the defendants and their supervisors, but also an order by the county court effecting his release. *Cf. Evans v. Community Educ. Ctrs., Inc.*, Civil Action No. 13-1642, 2015 WL 5334237, at *2 (E.D. Pa. Sept. 11, 2015) (noting that "only a court has authority to release individuals from prison"). In addition, we note that the decision to withdraw the violation charges would have involved an exercise of the parole officials' discretion, as the cessation of criminal proceedings is not automatically dispositive of the technical violation that had been charged. Under these circumstances, it was not unreasonable to expect parole, court, and jail officials to take six days to effect his release.

Viewing the evidence in the light most favorable to the plaintiff, we

find the defendants are entitled to judgment as a matter of law with respect to the plaintiff's claim that they unreasonably delayed his release from jail after they were informed that local police would not be filing criminal charges against him.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment will be granted. Judgment will be entered in favor of the defendants and against the plaintiff on all claims asserted in the amended complaint.

An appropriate Order will follow.

Dated: March 29, 2019          *s/Joseph F. Saporito, Jr.*
JOSEPH F. SAPORITO, JR.
United States Magistrate Judge